FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2020 APR 26 PM 4:34

MARGARET BOTKINS, CLERK
CHEYENNE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

ANITA C. DESELMS, et al.,

        Plaintiffs,

vs.

OCCIDENTAL PETROLEUM
CORPORATION, et al.,

        Defendants.

Case No. 19-CV-0243-F

---

## OPINION GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO CERTIFY CLASS

By their second amended complaint, Plaintiffs bring an antitrust case which seeks to establish a class to compensate all similarly situated persons for injury caused by Defendants' (collectively "the Anadarko defendants" or "Anadarko") allegedly anticompetitive conduct. CM/ECF Document ("Doc.") 81. More specifically, Plaintiffs allege Anadarko is the single largest non-governmental owner of minerals in Laramie County, Wyoming. As alleged, Anadarko devised an anticompetitive scheme to give itself maximum economic benefit in this area, to the disadvantage of neighboring mineral owners and competitors who, because of the scheme, could not lease their minerals.

To explain how Anadarko became the single largest non-governmental mineral owner in Laramie County, one must step back to the 1860's when the federal government wanted a transcontinental railroad. To promote such an undertaking, the government

allowed Union Pacific to earn 20 miles (surface and minerals) on each side of the railroad tracks in a "checkerboard" pattern of land ownership (Union Pacific earned only the odd-numbered sections). Doc. 204, pp. 2-3. This checkerboard swath of land runs across southern Wyoming and is referred to as "the Land Grant." The Land Grant in southern Wyoming includes the North DJ (Denver-Julesburg) Basin. Doc. 190-4, p. 5. Oil and gas within the Codell and Niobrara geologic formations of the North DJ underlying the Land Grant are at issue in this case.

Over time, Union Pacific set up Union Pacific Resources Company to own and manage the Land Grant. Doc. 207, p. 3. Anadarko acquired Union Pacific Resources in 2000 and Defendant Occidental Petroleum Corp. acquired Anadarko in 2019. Doc. 190-4, p. 4. In 2020, Defendant Occidental sold its Land Grant holdings to Orion Mine Finance, later to be held by Sweetwater Trona Holding Company. *Id.* at p. 5. Notwithstanding these transactions, the Court will continue to refer to all Defendants as either "Anadarko" or "the Anadarko defendants."

Anadarko set up separate sister companies to own the mineral interests in the Land Grant, so that one Anadarko entity would own the minerals and the right to lease, and a different Anadarko entity would own the lease and the right to develop the minerals. Consequently and for the relevant time, Anadarko had the mineral interests in most odd-numbered sections formerly belonging to Union Pacific, while Plaintiffs had interests in certain neighboring even-numbered and odd-numbered sections.

Following the successful completion of many horizontal wells in eastern Laramie County (primarily in the Codell formation), that area became the subject of intense focus

2

by the oil and gas industry, including Anadarko. Plaintiffs allege Anadarko devised an anticompetitive scheme to control development of this part of the Land Grant. The scheme involved "(a) placing a 30% royalty rate on [Anadarko's] minerals that would serve as a bar to development, and (b) filing DSUs/APDs[1] to subdue any competing operator's appetite for developing mineral in that area." Doc. 211, p. 11. In short and as the Court understands it, Plaintiffs' <u>antitrust theory</u> is that Anadarko's anticompetitive scheme delayed development of Class Minerals "in order to preserve Anadarko's advantage in obtaining leases of non-Anadarko (Class) minerals at lower lease costs and lower royalty rates" which negatively impacted Class Members and caused them damages. Doc. 200, p. 5.

On January 29, 2022, Plaintiffs filed a renewed motion for class certification.[2] Doc. 171, 199. In relevant part, Plaintiffs seek to establish a class of "[a]ll persons[3] having ownership of Class Minerals during the Class Period as those unleased minerals were set forth in a listing provided to the Court." Doc. 218, p. 2. The Class Period is from November 1, 2017 through October 19, 2020. Doc. 218, pp. 2-3. "Class Minerals"[4] is defined (in relevant part) as:

> Oil and gas mineral interests in the relevant market or submarket in [ ] Laramie County, Wyoming, that were:

---

[1] "DSUs" refers to drilling and spacing units and "APDs" refers to applications for permits to drill.

[2] Plaintiffs' first motion was denied without prejudice. Doc. 141.

[3] Plaintiffs' proposed Class excludes "affiliates of the Court, lessees of Class Minerals during the Class Period, government landowners, persons who opt out of the Class, and Defendants and their affiliates including entities in which Defendant has a controlling interest and entities controlled by a buyer of Defendants' leases or minerals, including Cowboy Land LLC, Sweetwater Trona Hold Co LLC, and any other affiliate of Orion Mine Finance Group." Doc. 218, p. 2. Plaintiffs' expert, Mr. Corbett, states "there will be over 500 potential class members." Doc. 201, p. 10.

[4] Plaintiffs represent they have constructed a complete list of Class Minerals. Doc. 113-1.

(a)     Not under an oil and gas lease to drill and operate wells during the Class Period;

(b)     Located in the Niobrara and/or Codell geologic formations [ ] east of the eastern boundary of Range 67W having oil and gas pools that could be reasonably produced as demonstrated by industry's filing of drilling spacing applications or applications for drilling permits in at least 50% of the sections in the relevant township; and

(c)     Located either:

a.      Within one section of a section that had a 30% royalty Intracompany Lease covering at least 50% of the oil and gas minerals provided the lease or memorandum of the lease was filed in the Laramie County public records disclosing the royalty rate, or

b.      In a section (or a part thereof) immediately bounded to the north, south, or both by a section in which Defendants had a 30% royalty Intracompany Lease as set forth in subparagraph a.

*Id.* at pp. 8-9.

Plaintiffs' renewed motion also seeks to designate Anita C. Deselms, John C. Eklund, Jr., Justin W. and Brandi J. Miller, Ron Rabou, and Russell I. Williams, Jr. as the representatives of the class, and moves for the appointment of Robert P. Schuster of Robert P. Schuster, P.C. as lead counsel for the class. Doc. 199. Defendants oppose certification largely on the basis that Plaintiffs have not met their burden under Rule 23(b)(3) to establish predominance and superiority. Doc. 190.

Based on the following and the Court's rigorous analysis relating only to the class certification issue,[5] combined with its revisions to Plaintiffs' theory of antitrust violation, the Court finds Plaintiffs have met their burden under Fed. R. Civ. P. 23(c)(4) to satisfy the requirements for certifying a class on the Federal and State issues of antitrust violation and antitrust impact. The Court finds that the claims of the proposed Class Representatives are typical of the claims of the class, and that they will fairly and adequately protect its interests. There is no dispute as to the appointment of the proposed lead counsel, and the Court finds that such appointment is appropriate.

## INTRODUCTION AND OVERVIEW

Plaintiffs' theory of antitrust liability does not arise in a vacuum but instead relates to and depends on a general understanding of the Wyoming oil and gas regulatory program and what is referred to as Anadarko's "Secure Operatorship Capture Program."

1. Wyoming Oil and Gas Regulatory Program

The State's regulatory program is administered by the Wyoming Oil and Gas Conservation Commission (WOGCC), and its purpose is to "prevent[] waste of Wyoming oil and gas resources and protect[] the correlative rights of property owners." *See* Wyo. Stat. § 30-5-101 et seq. ("the Act") and *Union Pac. Res. Co. v. Texaco, Inc.*, 882 P.2d 212, 223 (Wyo. 1994). Relevant to this dispute, the Act empowers the WOGCC to (1) regulate wells (e.g., permitting, spacing, drilling and plugging) (Section 30-5-104(d)(ii)); (2) establish drilling units ("drilling and spacing units" or "DSUs"); and (3) in the absence of

---

[5] The findings stated in this Order apply only to the motion for class certification. If the jury or factfinder's finding on any fact differs from any finding made in connection with class action certification, the ultimate factfinder's finding on the merits will govern the judgment.

voluntary pooling, enter a pooling order for a DSU ("forced pooling"). Section 104(d)(i),(ii) & (iv), and Section 109.

*a. Wells*

Prior to drilling any well, the owner or operator must file an application for a permit to drill (APD) along with a fee for the permit. WOGCC Rules ch. 3, § 8(a). If the fee is paid and a complete application is submitted which complies with the regulatory program, the WOGCC "shall promptly issue such a person a permit to drill." Wyo. Stat. § 30-5-115. If drilling is not commenced, the permit to drill expires after two years from the date of issuance; however, an operator may request a two-year extension upon paying a fee. Doc. 207, p. 4. During most of the relevant time period, the number of APD extension requests was unlimited. *Id.*

In March of 2018 and in response to the "volume of APDs" filed, WOGCC staff issued a policy statement to the effect that staff "was implementing a system to prioritize the approval process. The staff will perform a basic completeness check prior to assigning the API number[6] for all APDs received and APDs to be processed for final approval will be based on an operating submitted rig schedule every six months." Doc. 190-4, p. 5. Consequently, the basic completeness check did not require a drilling rig schedule to be submitted. *Id.* The March 2018 policy statement also said, "Per Chapter 3, Section 8(h), the date an API is assigned is the date of issuance." *Application for Permit to Drill*

---

[6] While undefined by WOGCC rules, the Court understands "the API number" to refer to the American Petroleum Institute number, which is used as a unique identifying number for wells in the United States. That number is then used by the WOGCC to identify and track an oil and gas well that is described by location in the APD.

*Processing Policy*, March 13, 2018, WOGCC - Current Policies (wyo.gov) (checked March 29, 2022).[7]

"In the development of oil and gas resources, Wyoming is a *first-to-file* state." *EME Wyoming, LLC v. BRW East, LLC*, 486 P.3d 980, 982 (Wyo. 2021) (emphasis added). This means "the first developer to apply and receive a permit over authorized spaces in a drilling spacing unit becomes the 'operator'." Doc. 190-4, p. 6. After the March 2018 policy statement, which severed the basic completeness review and assignment of an API number from the final approval of the permit (which would require a drilling rig schedule), the first-to-file rule afforded "incumbent operator status" to a developer effective the date an API number was assigned. By virtue of the staff reference to WOGCC Rules Chapter 3, Section 8(h), the developer not only had incumbent operator status as the first to file, but also the following benefits of a "permit" (without a drilling rig schedule or receipt of a final approved permit):

> If drilling is not commenced, the permit to drill shall not be valid after the expiration of a period of two (2) years from the date of the issuance thereof by the Commission or its Authorized Agents. A new application shall be submitted no more than two months prior to the expiration date of the permit to drill, along with a $500.00 extension fee, in order to request a two (2) year extension from such expiration date.

*Id.*

Importantly, the developer could remain incumbent operator for an indefinite time if a new, "basically complete" APD is filed and the extension fee is paid.

---

[7] The reference to the rule in the policy statement is confusing as the rule applicable before (and after) the 2019 rule change does not say what the policy statement represents.

### b. DSUs for Horizontal Wells[8]

Horizontal drilling has become a common method to recover oil and gas from tight sand and shale formations. For the relevant time, the WOGCC rules established permanent 640 acre (one section) DSUs for a horizontal well for each pool. WOGCC Rules, ch. 3, §2(b). However, an operator could request an order from the WOGCC modifying the DSU size as well as the number and direction of horizontal wells. Doc. 207, p. 4. Any such modification requires supporting geologic and engineering evidence to show maximum efficient recovery of oil and gas and protection of correlative rights. *Id.* The rules did not limit the number of operators allowed to operate within an established DSU. *Id.*

However, the first-to-file rule — along with the potential for perpetual permit extensions — collided with industry's "rush to secure as much control over a DSU as possible" (the same rush/race which led to the 2018 change to the APD approval process). Doc. 190-4, p. 5. Now staff workload was not the only problem, but the WOGCC saw an increasing number of operatorship challenges for control of DSUs. Doc. 207, p. 5. In other words, *first-to-file status* created an incumbent operator who could control and renew operatorship without limitation (even with no drilling rig schedule on file and no final approval to drill). Operatorship challenges arose because the situation limited others within the DSU from exercising their own development plan.[9] *Id.*

---

[8] The WOGCC defines "Horizontal Well" to mean "a wellbore drilled laterally at an angle of at least eighty degrees (80°) to the vertical and with a horizontal projection exceeding one hundred feet (100') measured from the initial point of penetration into the productive formation through the terminus of the lateral in the same common source of hydrocarbon supply." WOGCC Rules ch. 1, § 2(z) (rules effective 06/03/2015 to 01/22/2018).

[9] "APD protests had become so common they became known as 'the permit wars'." Doc. 190-4, p. 6.

To help mitigate these operatorship disputes, the WOGCC rules were changed in 2019 "to clarify how objections to APDs are made, and solidified and better defined an operator's ability to control a DSU." Doc. 190-4, pp. 7-8.

*c. Forced pooling*

Wyoming Statute Section 30-5-109[10] authorizes the WOGCC to enter pooling orders for the development of a drilling unit that embraces two or more separately owned tracts. Pooling can be voluntary, but when owners do not consent to consolidate their interests for production, the WOGCC may compulsorily pool the non-consenting interests. "The purpose of forced pooling is to encourage participation and prevent obstacles to development of oil and gas." Doc. 190-4, pp. 6-7.

In such a "forced pooling" situation, non-consenting, unleased mineral owners do not receive payment for their interests in production until the operator has recovered 100% of the owner's share of equipment and operating costs, 300% of the costs of drilling and of well-completion, and 200% of the cost incurred on new in-well equipment (the "non-consent penalty"). Therefore, if a non-consenting unleased mineral owner is force pooled for a horizontal well in Laramie County, such an owner "most probably loses any benefit from the well." Doc. 208, p. 6 (citing Doc. 202).

Non-consenting leased mineral owners subject to forced pooling also pay the non-consent penalty, but they receive royalty payments from the operator, as the WOGCC allows the lease terms to prevail and the non-consent penalty does not apply to the royalty

_____

[10] This section was amended in 2020. Because the amendment took effect after the Class Period, the Court will not discuss the provisions of the new section.

interest as it is cost-free. Doc. 208, p. 6. Therefore, operators must factor in other mineral owners' royalty interests as a cost-free interest in considering the economics for a horizontal well.

2. Anadarko's Secure Operatorship ("SO") Capture Program.

Plaintiffs describe what is referred to as Anadarko's "Secure Operatorship Capture Program" as follows:

❖ Anadarko Land Corp. was the largest non-governmental mineral owner in Laramie County, Wyoming throughout the Class Period.

  o Anadarko was unwilling to drill because of capital and informational constraints.

  o Instead, Anadarko set an uncompetitive royalty rate of 30% to maximize revenue and curtail development[11] until Anadarko (a) had sufficient capital to drill its own wells, or (b) could sell the land grant asset for a value enhanced by the drilling successes of others.

❖ Mineral owners in sections adjoining Anadarko's sections were held hostage to Anadarko's pricing and demands.

  o Horizontal drilling is undertaken on a two-section basis because the lateral arm of wells extends for two miles.

  o Anadarko's 30% royalty rate prevented competitors from entering into leases with other mineral owners because the 30% royalty was cost prohibitive and made oil and gas development uneconomic.

❖ Anadarko used its position of market power to force unusually one-sided joint operating agreements.

Doc. 212, p. 3.

---

[11] Plaintiffs point out that this royalty rate was imposed on all Anadarko's land holdings in eastern Laramie County as a single, undifferentiated group. Doc. 212, p. 8.

According to Plaintiffs, Anadarko's anticompetitive scheme was done to exclude the class as a whole from the leasing market, thereby blocking the class from mineral development that would have otherwise occurred. *Id.* at p. 8; Doc. 183, pp. 17-18. Anadarko advances its view that it merely "worked to evaluate the North DJ asset and position[] themselves to develop it if it turned out to have potential." Doc. 190, p. 14.

## LEGAL STANDARDS

### 1. The Requirements for Class Certification Under FRCP 23

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, 131 S.Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). The United States Supreme Court has concluded "a party seeking class certification must affirmatively demonstrate his compliance with [FRCP 23]—that is, he [or she] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 131 S.Ct. at 2551. In addition, the Supreme Court instructed that "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* (internal quotations omitted). With this said, however, the Supreme Court has long recognized that class actions serve a valuable role in the enforcement of antitrust laws. As stated in *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972), "[e]very violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation."

Federal Rule of Civil Procedure 23 governs the process of class certification. To prevail in their efforts to certify a class, Plaintiffs must satisfy two sets of requirements: those set forth in Rule 23(a) and those contained in Rule 23(b). Under FRCP 23(a), one or more members of a class may sue as representative parties on behalf of all when (1) the class is so numerous that joinder of all members is impractical, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. These four requirements are commonly referred to as numerosity, commonality, typicality and adequacy.

As to Fed. R. Civ. P. 23(b), Plaintiff must satisfy at least one of the three alternative criteria, which generally tests whether common questions of law or fact predominate over other issues and whether a class action is superior to other adjudicative procedures. The predominance requirement is qualitative, and looks to "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). The predominance inquiry is "far more demanding" than the commonality requirement under Rule 23(a), *see, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997), and "predominance regularly presents the greatest obstacle to class certification." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014).

The court's duty as to the predominance requirement is to "take a 'close look' at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*,

569 U.S. 27, 34 (2013) (quotation omitted). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods*, 577 U.S. at 454-455 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123-124 (3d ed. 2005) (footnotes omitted)).

In order for this Court to perform the required "rigorous analysis" it may be necessary to "probe behind the pleadings" and look to the merits of Plaintiffs' causes of action. *Id.* "That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp.*, 569 U.S. at 34 (internal quotations and citations omitted). With this said, however, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 466, 133 S.Ct. 1184, 1194-95 (2013).

### 2. *The Applicable Federal Law*

Sherman Act § 2 is directed not only towards illegal monopolies; "[m]onopsonistic practices by buyers are [also] included within the practices prohibited by the Sherman Act." *Campfield v. State Farm Mutual Auto Insur. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008). Plaintiffs' antitrust liability theory relates to Anadarko's alleged monopsonistic power and

practices. Monopsony power, like monopoly power, is the "power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) (cleaned up)).

A plaintiff meets the elements of a monopsonization claim with a showing of "(1) the possession of [monopsony] power [by a defendant] in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from [its] growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71.

In the Tenth Circuit:

> [F]our elements must be proven to establish an attempt to [monopsonize] under Section 2 of the Sherman Act: (1) relevant market (including geographic market and relevant product market) in which the alleged attempt occurred; (2) dangerous probability of success in [monopsonizing] the relevant market; (3) specific intent to [monopsonize]; and (4) conduct in furtherance of such an attempt.

*Colo. Interstate Gas Co. v. Natural Gas Pipe Line Co. of Am.*, 885 F.2d 683, 693 (10th Cir. 1989), *cert. denied*, 498 U.S. 972 (1990).

To establish a private civil remedy and treble damages under the Clayton Act, however, the Plaintiffs must do more than establish the elements showing a violation of Section 2 of the Sherman Antitrust Act. A plaintiff must also establish that he has been injured in his "business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15; *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).

## DISCUSSION

### RULE 23(b)(3)

Because the dispute centers primarily on whether common issues predominate and the related question of manageability, the Court will first consider the predominance and superiority issues presented by the parties.

The predominance and superiority requirements relate to the manageability of a class action, and trial courts have "a wide range of discretion" in evaluating whether the requirements of Rule 23(b)(3) have been met. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 345 (1979) (noting that district courts "have broad power and discretion vested in them" as to the "certification and management of potentially cumbersome" class actions).

### I.    PREDOMINANCE

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 809 (2011). To establish an antitrust claim, a plaintiff must prove (1) a violation of antitrust law, (2) antitrust injury/impact caused by the violation, and (3) damages sustained by the plaintiff. *Bell Atlantic Corp.,* 339 F.3d at 302.

#### A. Antitrust Violation

The Court concludes that both parties will present common evidence to determine whether the Anadarko defendants did, or did not, lock up mineral production in the North DJ Basin underlying the Land Grant within Laramie County, in violation of Section 2 of the Sherman Antitrust Act. Plaintiffs are expected to offer the generalized class-wide

15

evidence of Anadarko's uniform course of conduct (summarized above) which allegedly excluded "competitors from operating in the North DJ Basin where Defendants appeared to have monopsony power." Doc. 203. Plaintiffs are also expected to offer generalized class-wide evidence from experts on issues of relevant market, monopsony power, exclusionary conduct, and the economic advantages to Anadarko, all of which focuses on the Anadarko defendants' conduct rather than individual class members.

The Anadarko defendants are expected to dispute specific intent to monopsonize. However, this would be expected as generalized class-wide evidence of their conduct and intent to merely work to evaluate the North DJ asset, position themselves to develop it if it turned out to have potential, and to lower royalty rates for development by others who approached them with reasonable development proposals.

As to relevant market, Plaintiffs argue the generalized class-wide evidence relates to: (1) the difference between the Wyoming and Colorado regulatory programs affecting the market for oil and gas leases,[12] and (2) the only buyer (essentially Anadarko) in the eastern Laramie County market for mineral leases in the north/south-oriented two-section DSUs and its ability to affect a significant decrease in price for such leases.[13]

The Anadarko defendants argue against certification on the basis that measuring market power throughout the Class Area will present individualized inquiries which defeat predominance. More specifically, the Anadarko defendants argue that, according to Plaintiffs' expert, each two-section, north-south DSU is its own market. As such, this

---

[12] *See* Doc. 209 (Righetti Decl.).
[13] *See* Doc. 208 (Wickelgren Decl.)

scenario requires individualized inquiries into Anadarko's market power based on percentages of leased minerals in these hundreds of markets.

As to this argument, the Court is unpersuaded. While the affidavit of Plaintiff's expert recognizes that each section *can* be viewed as its own product market, the affidavit goes on to opine that these sections can be grouped by competitive conditions, creating two distinct groups.[14] *See* Doc. 208, pp. 3-4 & 20-21. Therefore, according to Plaintiff's theory and common proof of monopsony power and monopsonizing conduct, there will be generalized class-wide evidence which focuses on these two distinct product market groups – one where Anadarko holds 100% monopsony power and the other where it holds 67% monopsony power. Doc. 218, p. 5. The Anadarko defendants can advance common class-wide evidence in an attempt to disprove sufficient monopsony power and market share to exclude rivals and suppress competition. Therefore, individual questions will not arise in determining whether the Anadarko defendants possessed monopsony power in the relevant market.

Through briefing and argument, there has been no argument advanced by the Anadarko defendants that they acquired, developed, grew or maintained monopsony power as a consequence of a superior product, business acumen, or historic accident. Should that arise, though, the Court sees this defense as one which can be advanced through generalized class-wide proof.

---

[14] The two groups are: "sections with a 30% Anadarko royalty in an intra-company lease to both the north and south of the section and sections with a 30% Anadarko royalty only on the north or the south, but not both." Doc. 208, p. 3.

Based on the above, the Court finds that the issue of antitrust violation is a common question that will be addressed with common proof for all proposed class members.

Before turning to the issue of antitrust impact, the Court is concerned about Plaintiffs' current theory of antitrust violation. This theory relates to Anadarko's two-part strategy to allegedly block and control oil and gas development of the entire Land Grant (its minerals and the Class Minerals). Thus, Plaintiffs embed Anadarko's conduct in applying for allegedly sham APDs/DSUs within its theory of liability. However, the Court previously held that "to the extent Plaintiffs' [monopsony] claims rely upon Defendants' acquisition of the permits, ... Defendants are immunized under [*Parker v. Brown*, 317 U.S. 34 (1943)], because the alleged harms arise just as much from WOGCC's approval of the permit complex as Anadarko's application for those permits." Doc. 31, p. 10.

The Court invited limited briefing by the parties to address the immunity question as it relates to Plaintiffs' current theory. Doc. 194. Having reviewed those filings, the Court agrees with Anadarko and concludes that its earlier order (Doc. 31) addresses Anadarko's application actions, and not just its acquisition of permits. Contrary to Plaintiffs' arguments, Wyoming afforded incumbent operator status to Anadarko within the state-approved DSUs where Anadarko was the first to file, thus the alleged harm (i.e., that Anadarko could limit others within the DSU from exercising their own development plans) arises as much from Wyoming's regulatory program (until it changed in November 2019), as it does from Anadarko's application actions.

The effect of this holding does not limit the Plaintiffs in "telling the full operatorship capture story" in order to place Anadarko's 30% intracompany lease actions in context.

However, Plaintiffs cannot embed immunized conduct in its theory of antitrust violation. Plaintiffs have solved this problem in a significant way by now proposing that the beginning date for the Class Period is November 1, 2017 (the earliest recorded intracompany lease), rather than July 1, 2016. Doc. 174, p. 8; 218, p. 3. This change avoids the problem of reaching back to immunized conduct for potential liability, which would be impermissible.

### B. *Antitrust Injury/Impact*

Antitrust impact is "injury [that] reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

The Court expects Plaintiffs to offer generalized class-wide proof that the Anadarko defendants blocked development, even at significant cost, for specific advantages. First, according to Plaintiffs' experts Finley, King and Wickelgren, Anadarko expected to benefit by a greater concentration of working interests in the development (for financial and informational gain). The second advantage is twofold in the form of financially advantageous options. According to these experts, Anadarko gained the option to obtain leases of non-Anadarko minerals at lower lease costs and likely lower royalty rates, to place it in the best position to effectively implement development on a large scale if the information it collected supported doing so. If development didn't occur, the second option would allow Anadarko to market its mineral rights in the area to a third party as almost completely undeveloped. Doc. 200, pp. 4-5 & 11; Doc. 208, p. 8, 14, 29.

Plaintiffs contend this anticompetitive conduct created a large area of negative impacts to every mineral owner in the area because these owners were excluded from the market. Plaintiffs argue this is class-wide injury (antitrust impact) with common evidence. Doc. 212, p. 17. According to Plaintiffs' experts Finley and Wickelgren, the negative antitrust impact includes (1) the lack of lease offers and lower realized lease bonuses because no firm other than Anadarko could profitably drill the most efficient type of well;[15] and (2) the lack of wells drilled by competitors[16] in proximity to Anadarko's 30% royalty leases – because such competitors could not expect that Anadarko would reduce its royalty burden – which destroyed efficiencies needed for economies of scale. Doc. 200, pp. 13-15 & 18; Doc. 208, p. 9, 27. Consequently, through this expected common proof from Plaintiffs' experts, the antitrust impact claimed by Plaintiffs is a reduction of the value for all mineral interests owned by the class.

Anadarko's briefing opposes certification first by arguing that Plaintiffs cannot prove antitrust impact through generalized, class-wide proof because there may be some individual class members who were not injured by the alleged antitrust violation. This argument seeks to impose upon Plaintiffs at the certification stage a virtually insurmountable burden of proof as to every class member. The Court concludes such a burden of proof is inconsistent with the long-standing precedence that class actions serve a valuable role in the enforcement of antitrust laws, as well as the "prevailing view" that

---

[15] A north-south, two-mile horizontal well. Doc. 208, p. 27.
[16] Mr. King identifies other operators who completed Codell and Niobrara horizontal wells: EOG Resources, Helis Oil and Gas, Kaiser Francis Oil, Samson Exploration, Longs Peak Resources, and North Silo Resources. Doc. 207, p. 12.

anticompetitive actions affect all market participants, "creating an inference of class-wide impact" even in cases where mineral leases are individually negotiated. *See In re Urethane Antitrust Litigation*, 768 F.3d 1245, 1254 (10th Cir. 2014). The inference of class-wide impact is especially strong here, where there is evidence that Anadarko's intra-company 30% royalty rate lowered the value of neighboring mineral interests, or at least lowered the starting point for any operator interested in leasing the neighboring minerals. Therefore, the Court is unpersuaded by Anadarko's burden-of-proof argument[17] to show class-wide antitrust impact at the certification stage, and will not hold Plaintiffs to such a burden.

Further, the Anadarko defendants identify individual issues that they contend undermine predominance but none of these individual issues align with Plaintiffs' theories of liability. As support, Anadarko posits a "*but-for world*" (i.e., a hypothetical situation in which the alleged anticompetitive conduct did not occur), and argues that highly variable issues would influence any individual leasing decision.[18] Doc. 190, p. 10. In short, Anadarko's briefing presumes that each class member is seeking damages based on the location of the individual member's mineral interest in the North DJ Basin. The Court rejects this argument because none of these individual issues argued by Anadarko align with Plaintiffs' theories of antitrust impact. Plaintiffs chose to assert theories of class-wide

---

[17] Anadarko relies in part on *Comcast Corp.*, 569 U.S. 27. For the same reasons explained by the Tenth Circuit in the case *In re Urethane Antitrust Litigation*, 768 F.3d 1245, 1257-1258 (10th Cir. 2014), this Court concludes that *Comcast* does not control the resolution of the antitrust impact issue in this case.

[18] These "highly variable issues" include: (1) the fact that the eastern portion was considered to be generally less proven and is far from developed minerals and lacks the necessary infrastructure; (2) variability in information and indications that the eastern section was not capable of being produced economically (e.g., formation thickness and water saturation); (3) operator variability including who had the right to drill particular Class Minerals and what "operating paradigms" and "economic hurdles" existed which would affect different operators differently; (4) variability as to the surrounding 30% royalty leases; and (5) variability of observed leasing outcomes. Doc. 190, pp. 26 – 34; Doc. 191-1, 190-2 & 190-3. The variables are also illustrated by maps shown in Doc. 212, p. 9.

impact, not individual impact. "[T]he choice of injury to assert is in the plaintiff's hands." American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, 8 (3d ed. 2017). Individual issues arising under a theory of liability that Plaintiffs do not assert do not defeat predominance.

Further, the fact that there may be some evidence about individual situations does not defeat predominance because, as noted above, the Plaintiffs' theory (and burden) does not require proof that every mineral owner lost value due to the alleged antitrust violation. Evidence that this was or was not the case for individuals may well be relevant to support or rebut the assumptions underlying Plaintiffs' theories. But this is in effect common evidence, and individual questions will not require resolution.

Additionally, the Court appreciates that Anadarko contests the opinion evidence that there is a class-wide loss of value. However, Anadarko does not argue, and this Court does not find, that no reasonable juror could believe Plaintiffs' common evidence such that the proffered opinion evidence should be disregarded.[19] Anadarko's assertions, therefore, go to the persuasiveness of Plaintiffs' evidence and do not negate the fact that the evidence is common proof.

In conclusion, based on the Court's review of the proffered evidence in support of Plaintiffs' antitrust impact theories, the Court finds that the theories are common to all class members: i.e., proving an impact theory for a single class member would prove it for all

---

[19] Of course, if no reasonable juror could believe the class-wide evidence, Plaintiffs would lack common proof. *Tysons Food*, 136 S. Ct at 1049 (comparing class certification standards to standards for summary judgment and directed verdict). That does not appear to be the case on the current record, and any arguments that Plaintiffs' evidence fails to prove some elements required to show antitrust violation or antitrust impact can be addressed at summary judgment or at trial.

without the need for individualized inquiry. Therefore, the Court finds that Plaintiffs' theories of anti-trust impact present common questions for which common proof will be proffered.

## C. Damages

Plaintiffs present the Declaration of Timothy Fitzgerald, Ph.D. (Doc. 205), in support of its arguments that the damages suffered by Class Members due to Defendants' monopsonistic conduct can be determined through a common methodology and common evidence. According to Plaintiffs, Dr. Fitzgerald's methodology will result in "a calculation of aggregate damages sustained by the class within a prescribed region on a net mineral acre basis, which is uniform for each owner of a mineral acre and does not require consideration of individual factors." Doc. 211, p. 44. Alternatively, Plaintiffs argue if the Court is concerned about individualized damage issues, the Court should nonetheless certify the proposed class for the purpose of determining whether Anadarko's conduct violated antitrust laws. *Id.* at p. 49.

Anadarko argues that the variability in lease terms and ultimate revenue from development also give rise to individualized inquiries. As to Plaintiffs' "aggregate" damages model, Anadarko argues this model is inconsistent with Plaintiffs' theory that Anadarko's conduct was to delay, not foreclose for all time, the development of the Class Minerals. Because Plaintiffs' model does not calculate damages resulting from deferral of revenues, it cannot possibly establish that damages are susceptible to measurement across the entire class. In short, according to Anadarko, any aggregate model will undoubtedly

23

result in a windfall for Class Members who have suffered little or no antitrust impact, while under-compensating those who, on Plaintiff's theory, were adversely impacted.

On this point the Court is persuaded that damages cannot be certified at this time. While variability considerations are of some concern, the Court finds that the proposed damages model does not match the antitrust violation theory (the 30% intracompany royalty). As noted above, the Court has immunized certain conduct and Plaintiffs have shortened the Class Period. It is unclear whether this has been considered by Plaintiffs' expert, Dr. Fitzgerald. Second, the Court agrees with Anadarko that the proposed damages model presumes the effect of Anadarko's alleged anticompetitive conduct was to foreclose for all time the development of Class Minerals. Doc. 190, p. 37. A certified damages case would require admissible expert opinion evidence on a class-wide basis supporting the view that there are no post-class period lease revenues attributable to the Class Minerals. Such opinion evidence, and the supporting bases, do not appear to be in Dr. Fitzgerald's declaration.

For all these reasons, at this time and based on the record presented, the Court finds that Plaintiffs have failed to meet their burden to satisfy the predominance inquiry as to damages. Fed. R. Civ. Proc. 23(b)(3).

## II. SUPERIORITY

As to Anadarko's superiority argument, the Court is unpersuaded. The Court certainly acknowledges that there likely is remaining work to do to provide notice to Class Members. However, as argued by Plaintiffs, "[t]he issue is not whether this case will create management problems if prosecuted as a class action; it is whether it will create relatively

24

more problems than the reasonably available alternatives." Doc. 211, p. 46, citing *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009). Given that the certification is only for Federal and State issues of antitrust liability (i.e., antitrust violation and antitrust impact), and given the summary of evidence proffered by Plaintiffs which provides an overview of some expected common proof, there is no reason to burden either the courts or the parties with the requirement to file individual suits, secure costly experts, and repeatedly litigate the same elements of an antitrust liability case.

In short, there are two common questions that could yield common answers at trial: the existence of an antitrust violation and the existence of impact. These questions will drive the litigation and generate common answers that will determine liability in a single stroke. Therefore, the Court finds that Plaintiffs have met their burden to show "that a class action [on liability] is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## RULE 23(a)

As noted above, the Anadarko defendants do not seriously contest whether some of the requirements of Rule 23(a) have been met. The only exceptions are the typicality and adequacy requirements, which are addressed below. However, for the sake of completeness, the record is clear that all requirements have been met for a liability class.

## I.   NUMEROSITY

Plaintiffs' expert Mr. Corbett opines that, while there is the potential for 2,000 putative class members, he believes there will be at least 500.[20] Doc. 201. He also notes that these members are located in a variety of other states and two other countries. While there is "no set formula" to determine whether a class is sufficiently numerous to be certified, *Rex v. Ownes ex rel. Oklahoma*, 585 F.2d 432, 436 (10th Cir. 1978), the Court finds (and Anadarko does not contest) that the proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

## II.   COMMONALITY

To satisfy the commonality requirements, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality does not require that all, or even most questions are common, and "even a single common question will do." *Dukes*, 564 U.S. at 359. As noted above, this case involves common questions of antitrust violation and antitrust impact based on the same alleged facts and legal theories. These questions easily satisfy the requirements of Fed. R. Civ. P. 23(a)(2).

## III.   TYPICALITY

Anadarko argues the six Class Representatives proposed are not "typical" of all mineral owners in eastern Laramie County and because of this, they will not adequately represent the Class. Anadarko points out that their alleged anti-competitive conduct was not uniform throughout the Class Area as it implemented different strategies at different

---

[20] A map of the Class Minerals owned by the class can be found in Doc. 212, p. 6.

times in different portions of the Class Area. The Court finds that Anadarko's arguments go to issues previously addressed and either rejected or not subject to the certification order (i.e., damages). Therefore the Court finds Plaintiffs have satisfied their burden to show that the claims of the proposed Class Representatives are "typical of the claims … of the class." Fed.R.Civ.P. 23(a)(3).

## IV. *ADEQUACY*

Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). It "serves to uncover conflicts of interest between named parties and the class they seek to represent," as well as "competency and conflicts of class counsel." *Amchem*, 521 U.S. at 625 & n.20.

The Class Representatives and Counsel have stated "there are no significant conflicts of interest and they will vigorously pursue justice on behalf of the class." Doc. 211, p. 34. As to Class Counsel, the Court is satisfied that counsel for the class are experienced in oil and gas litigation, complex litigation generally, and antitrust actions specifically, and will vigorously prosecute and conduct the litigation to the highest professional standards.

Anadarko argues the Class Minerals owned by the proposed Class Representatives are clustered in one corner of the Class Area where Anadarko held "first to file" APDs/DSU for development. Anadarko argues this status (and its immunity protection) creates a significant risk that the Class Representatives' argument of anticompetitive conduct will fail, thus creating a conflict with other Class Members.

As with Anadarko's arguments against typicality, these arguments go to issues previously addressed and either rejected or not subject to the certification order. Therefore, the Court finds Plaintiffs have satisfied their burdens to show that Class Representatives and Counsel have no significant conflicts of interest and they will fairly and adequately protect the interests of the class. Further, the Court finds that proposed class counsel is qualified and competent to satisfy the requirements of Rule 23(g). Therefore, the requirements of Rule 23(a)(4) are satisfied.

## CONCLUSION

In arriving at its findings and conclusions, the Court relied on a well-defined series of cases outlining the legal requirements on standards for class certification pursuant to Fed. R. Civ. P. Rule 23. As such, except for considering the expert opinions for the required rigorous analysis relating only to the class certification issue, the Court did not evaluate the merits of those opinions—that is left for a later date. Accordingly, for the reasons set forth above,

**IT IS HEREBY ORDERED** that

1. Plaintiffs' Renewed Motion to Certify Class [Doc. No. 199] is **GRANTED IN PART AND DENIED IN PART**. With the Court's revisions to Plaintiffs' theory of antitrust liability and to the definition of "Class Period," Plaintiffs' Motion is Granted under Fed. R. Civ. P Rule 23(c)(4) with respect to the Federal and State liability issues (antitrust violation and antitrust impact) against Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC, Anadarko Land Corp., Anadarko Oil & Gas 5 LLC.

2. Plaintiffs Anita C. Deselms, John C. Eklund, Jr., Justin W. and Brandi J. Miller, Ron Rabou, and Russell I. Williams, Jr. are appointed class representatives.

3. Robert P. Schuster of Robert P. Schuster PC is appointed lead class counsel.

4. Plaintiffs' Renewed Motion to Certify Class is otherwise **DENIED WITHOUT PREJUDICE**.

5. The Court will enter a separate Order defining and certifying the class, designating class representatives and class counsel, and addressing notice to the class. Please see the attached Form of Order. Counsel shall meet and confer, complete the dates left open in the Form, and email the final proposed Form of Order to chambers email address on or before May 17, 2022. Any revisions to the Form of Order, beyond inserting proposed dates, shall be clearly visible in "red-line" or "track change" mode.

    Dated this 26 day of April, 2022.

<br>

NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE